**IN THE UNITED STATES DISTRICT COURT,**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| JEFFERY P. ECKERT, an individual, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. |
| NEAL H. LEVIN, an individual and FREEBORN & PETERS LLP an Illinois Limited Liability Partnership | )<br>)<br>) **PLAINTIFF DEMANDS**<br>) **TRIAL BY JURY**<br>) |
| Defendants | )<br>)<br>) |

# COMPLAINT

Plaintiff, JEFFERY P. ECKERT ("Eckert"), by and through his undersigned attorneys, THE PATTERSON LAW FIRM, LLC, complains against Defendants, NEAL H. LEVIN ("Levin"), and FREEBORN & PETERS LLP ("F & P"), as follows:

## I. NATURE OF THE CASE

1. This is an action for legal malpractice, professional negligence, and fraud against Defendants, a law firm and one of its attorneys, arising from their advice and recommendation that Eckert, who was represented by separate legal counsel, enter into a written Settlement Agreement with Gregory Steiner ("Steiner"), also Defendants' client, and agree to pay Steiner an amount in excess of $700,000, plus interest. In the course of providing their advice and recommendation to Eckert, and as an inducement to enter into the Settlement Agreement, Defendants promised to raise sufficient funds from the sale of a portion of Eckert's businesses to their clients or a third-party or third-parties to pay the $700,000 plus interest that would become due by Eckert to Steiner under the Settlement Agreement. Defendants are not licensed under

State or federal law to raise money from third-parties. Nonetheless, they fraudulently induced Eckert to enter into the Settlement Agreement, did not raise money to pay the $700,000 plus interest that would become due by Eckert to Steiner under the Settlement Agreement, and were not qualified or experienced in fundraising, contrary to their representations to Eckert.

2. Defendants, as Steiner's legal counsel, were financially motivated and driven to provide erroneous advice, recommendations, and promises to Eckert and to fraudulently induce Eckert to enter into the Settlement Agreement outside of, and without the knowledge of, Eckert's counsel, as they were owed over $600,000 in unpaid legal fees by Steiner for their representation of Steiner against Eckert.

3. Upon information and belief, it was understood between Defendants and Steiner that any monies ultimately either raised by Defendants or paid by Eckert under the Settlement Agreement, would first be used to pay legal fees due by Steiner to Defendants, before Steiner would receive any of the settlement proceeds.

## II. PARTIES AND OTHERS

4. Plaintiff, Eckert, is an individual and a citizen of the State of North Carolina. At all relevant times, Eckert was a client of Levin and F & P.

5. Defendant, Levin, is an individual and a citizen of the State of Illinois residing in the County of Cook. Levin, at all relevant times, was and is an attorney licensed to practice law in the State of Illinois and an employee of F & P. At all relevant times, Levin and F & P represented (a) Steiner in a lawsuit against Eckert, and (b) in a separate lawsuit, a Trustee in a bankruptcy against Eckert's wife, Christine Eckert.

6. Defendant, F & P, is an Illinois limited liability partnership with its principal place of business located at 311 S. Wacker Drive, Suite 3000, Chicago, Illinois 60606. None of F & P's equity partners – owners – are citizens of the State of North Carolina.

7. Steiner is an individual and citizen of the State of Illinois. At all relevant times, Steiner was, and is, a client of Levin and F & P.

### III. JURISDICTION AND VENUE

8. Subject matter jurisdiction lies within this Court pursuant to 28 U.S.C. Section 1332, in that Plaintiff is a citizen of a different state than Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue lies within this Court pursuant to 28 U.S.C. Section 1391(a)(2) in that a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

### IV. ALLEGATIONS COMMON TO ALL COUNTS

10. On or about October 15, 2004, Steiner, individually and on behalf of AgriStar Frozen Foods, Inc. ("AgriStar"), filed a Complaint against Eckert, Platinum Frozen Foods, Inc., Benchmark Holdings Group, Inc., Meadows Cold Storage, Inc. and others, in the Circuit Court of the Eighteenth Judicial Circuit, DuPage County, Illinois ("Case Number 2004 CH 1429"). Eckert then filed a Counterclaim against Steiner in Case Number 2004 CH 1429. Steiner and AgriStar were represented by Levin and F & P. Subsequently, Case Number 2004 CH 1429 was dismissed with leave to reinstate.

11. On or about June 23, 2009, Case Number 2004 CH 1429 was reinstated under Case Number 2009 CH 2305 in the Circuit Court of the Eighteenth Judicial Circuit, DuPage County, Illinois, including the Counterclaim ("Case Number 2009 CH 2305").

12. Subsequently, Levin and F & P, while representing Steiner in Case Number 2009 CH 2305, approached Eckert, while Eckert was represented by Douglas Drenk ("Drenk"), an attorney licensed to practice law in the State of Illinois, and outside the presence of Eckert's counsel, persuaded him to enter into a settlement agreement with Steiner.

13. Levin promised Eckert that, in exchange for Eckert signing the settlement agreement, Levin and F & P would represent and assist Eckert in connection with his efforts to raise capital financing for his businesses. Levin stated that Eckert could use the financing that Levin and F & P would raise to satisfy the $700,000 plus interest that would become due to Steiner under the settlement agreement.

14. Beginning in approximately December 2009, Levin and F & P acted as attorney and investment banker for Eckert. At the same time, however, Levin and F & P were simultaneously representing Steiner in Case Number 2009 CH 2305. Defendants' conflict of interest and repeated breaches of the standard of care, and fraud as alleged herein, were motivated and driven by Defendants' desire to be paid for their representation of Steiner against Eckert and the over $600,000 in fees due to F & P by Steiner.

15. In approximately December 2009, notwithstanding the fact that Eckert was represented by Drenk, Levin began exchanging almost daily emails with Eckert outside of Drenk's presence, in which Levin provided Eckert with legal advice regarding the financing of KBR, one of Eckert's businesses.

16. From December 2009 through to the present, Levin and Eckert have exchanged hundreds of emails regarding, among other things: (1) KBR, (2) the raising of monies to fund the amount needed to satisfy the Settlement Agreement, (3) Case Number 2009 CH 2305, (4) Eckert's options to avoid paying the amounts due to Steiner under the Settlement Agreement,

4

and (5) Levin's and F & P's efforts to stave off Steiner from collecting on the judgment that would be entered pursuant to the Settlement Agreement. (True and correct copies of emails exchanged between Levin, F & P, and Eckert from December 2009, through December 2011, are attached hereto as Group Exhibit "A".)

17. At that time, Levin misrepresented to Eckert, that in addition to being an experienced and skilled attorney in the areas of fund-raising, bankruptcy, creditors rights, and the satisfaction and collection of judgments, he was skilled in the business of raising monies for the benefit of his clients and others. He further represented to Eckert that he had a myriad of contacts and a number of wealthy family members at his disposal who would be happy to invest in Eckert's business. Levin promised to put all of his experience, skill, and fund-raising acumen to work for Eckert if he would only execute the Settlement Agreement.

18. On or about December 2, 2009, Levin informed Eckert that he had chosen a business advisor that may be able to help Eckert develop a business plan for KBR. However, according to Levin, any developed business plan would "necessarily" require the inclusion of a line item dedicated to paying Eckert's obligations to Steiner pursuant to the Settlement Agreement that Defendants were attempting to induce Eckert to sign, outside the presence and knowledge of his attorney. (*Id*. at 8.)

19. The following day, on December 9, 2009, Levin represented to Eckert that "a settlement would make it so that you wouldn't have a judgment (or any lawsuit) against you, making it that much easier (or even possible) to get financing for your business." (*Id*. at 10.) Later that day, Levin argued that "the advisor will build a plan that has a line-item for repayment to us [Steiner] while you develop and grow the business. "**It's a triple win and shuts down all litigation for you**." (Emphasis added) (*Id*. at 8.)

5

20. On or about December 17, 2009, Levin began introducing Eckert to potential business advisors. (See emails dated December 17, 2009, at 13; January 26, 2012, at 20; and March 7, 2011, at 39-40.)

21. Pursuant to, and in reliance on, Levin's legal advice, Levin's skill and experience, Levin's commitment to obtain capital financing for Eckert (which would also be used to satisfy any and all proceeds due to Steiner under the Settlement Agreement), Levin's purported expertise in raising equity, and Levin's myriad of contacts and wealthy family members at his disposal, on or about June 29, 2010, Eckert signed the Settlement Agreement with Steiner (the "Settlement Agreement"). The Settlement Agreement provides that Eckert will pay $700,000 plus interest to Steiner as follows:

> (a) The greater of $50,000 on or before December 31, 2010, or, if occurring earlier and in an amount exceeding $50,000, ***12.5% of any capital invested in or loan proceeds received by [KBR] or any other business enterprise owned and/or managed by Eckert***, up to and including the Settlement Amount;
>
> (b) Thereafter, if the Settlement Amount has not bee [sic] paid in full, then the greater of $100,000 on or before December 31 of each year thereafter, or, if occurring earlier and in an amount exceeding $50,000, ***12.5% of any capital invested in or loans proceeds received be [sic] KBR or any other business enterprise owned and/or managed by Eckert,*** up to and including the Settlement Amount." (A true and correct copy of the Settlement Agreement is attached hereto as Exhibit "B" and made a part hereof.)(emphasis added).

22. At all relevant times, Levin has also: provided Eckert with legal advice; solicited investors for KBR; drafted a Partnership Agreement and Operating Agreement for Eckert; and conducted, participated in, and attended meetings on behalf of KBR, and revised KBR's business plan for Eckert. (See, e.g., emails dated March 10, 2011, at 41; March 14, 2011, at 47; March 16, 2011, at 49; March 18, 2011, at 55-6; March 23, 2011, at 63; March 25, 2011, at 68; March 28, 2011, at 70; April 1, 2011, at 71-2; April 15, 2011, at 77; April 20, 2011, at 78; April 22, 2011, at 81; April 28, 2011, at 83; May 17, 2011, at 86-7; May 20, 2011, at 90; June 17, 2011, at 100;

June 1, 2012, at 101; June 7, 2011, at 104; June 8, 2011, at 105 and 107-8; June 9, 2011, at 113 and 115; June 30, 2011, at 117-20; July 6, 2011, at 122-6 and 128-9; July 12, 2011, at 132; July 19, 2011, 134; and July 20, 2011, at 135.)

23. The amount due by Eckert to Steiner under the Settlement Agreement is approximately the same amount as the legal fees owed by Steiner to F & P for services rendered to Steiner in Case Number 2004 CH 1429 and Case Number 2009 CH 2305.

24. The emails exchanged between Levin and Eckert clearly establish that Levin was acting as legal counsel for Eckert. While simultaneously representing Steiner, Levin specifically refers to Eckert as either a client of Levin or a client of F & P in his correspondence with third-parties. (See emails dated June 1, 2011, and June 7, 2011. *Id* at 101 and 104-5.)

25. At the same time that Levin was representing Eckert, Levin continued to represent Steiner. In fact, in several of his emails to Eckert, Levin discusses Steiner's claims against Eckert in Case Number 2009 CH 2305.

26. On October 25, 2011, Levin emailed Eckert and stated, "Both the Trustee and Steiner are clamoring about enforcing the judgments. We need a game plan other than 'brokering to keep the lights on.'"(*Id*. at 144.)

27. On December 1, 2011, Levin emailed Eckert and stated, in relevant part, "I've sent the updated [business] plan on to more folks…In the meantime, **we need to have the judgment entered to keep [Steiner] at bay**…" Later that day, Levin stated, "Per the settlement agreement, [Steiner] could have gotten a judgment without even giving you notice long ago. **I've held [Steiner] off** though he rightfully wants to know that the procedural steps are completed." (See email dated December 1, 2011. (*Id*. at 147)(emphasis added)).

28. On December 3, 2011, Levin emailed Eckert and stated, "We have to move to the next step [Eckert]. I'm willing to continue to help as I've done the past week but we need the judgment in place as security, which is what was agreed to under he (sic) agreement." *(Id* at 152.)

29. On December 5, 2011, Levin emailed Eckert and stated, "I assure you in writing that I am up to nothing presently other than securing the judgment pursuant to the Settlement Agreement and helping to introduce potential funding sources and other resources to you and your project."

30. Later that day, Levin wrote, "I will suggest to [Steiner] that the judgment not be recorded at this time…" (*Id*. at 160.)

31. On December 14, 2011, Levin wrote to Eckert:

> [Eckert], you need to look at what I've done so far to see that my intent on helping has been sincere. We could have persuaded the finalization of these judgment [sic] long ago. I didn't need to hook you up with Jack. I didn't need to review and force you to understand and update all of the [business] plans. I didn't need to go to Hansen. On and on I've shown you I do indeed hope that you can make a go for this. However, there are certain hurdles that will be difficult and overcome…the first is your stubbornness relative to certain suggestions that were made along the way.
> The second is the fact that you and [your wife] owe a significant amount of money and you've paid nothing. Unless you want to agree to start making payments, then we will proceed to protect [Steiner's] rights as well as those of the Trustee. As I said time and time again, I'll continue to make introductions, though we must not lose sight of the fact that these judgments are out there, they need to be preserved and we need to start seeing some money flow, even if nominal.

(*Id*. at 167.)

32. Despite his dual, and conflicting, representation of Eckert, Steiner, and the Trustee in Bankruptcy in a lawsuit against Eckert's wife, on or about December 12, 2011, Levin filled an Amended Motion to Enforce Settlement and Motion for Entry of Judgment in which he

8

and F & P, on behalf of Steiner, moved to enter a judgment in the amount of $1,000,000 in favor of Steiner and against Eckert. F & P subsequently re-noticed the motion for December 22, 2011.

33. On July 12, 2012, Steiner, represented by Levin and F & P, obtained a judgment against Eckert in the amount of $1,000,000 plus costs. (A true and correct copy of the Judgment is attached hereto as Exhibit "C").

34. Illinois Rule of Professional Conduct 1.7 provides as follows:

Rule 1.7: Conflict of Interest: Current Clients

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

1) the representation of one client will be directly adverse to another client; or

2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

1) the lawyer reasonably believes that the lawyer will be able to provide the competent and diligent representation to each affected client;

2) the representation is not prohibited by law;

3) the representation does not involve the assertion of assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before tribunal; and

4) each affected client gives informed consent.

Illinois Rules of Professional conduct, 1.7 (2010).

35. Comment 6 of Rule 1.7 provides that, absent consent, a lawyer is prohibited from representing a client in one matter and then prosecuting the same client in a different matter, "even when the matters are wholly unrelated." (*Id.*)

36. Levin never obtained the informed written consent to the same from either Eckert or Steiner.

37. From December, 2009 through June 29, 2010, Defendants strongly recommended, encouraged, and induced Eckert – outside of the presence, and without the knowledge, of his attorney – to accept a proposed settlement whereby, in exchange for a payment of $700,000 plus interest to Steiner, Levin agreed to raise the monies from Defendants' clients and third-parties necessary to satisfy any amounts due to Steiner by Eckert under the Settlement Agreement.

38. Defendants' acts and omissions in connection with their representation of Eckert were the bases of Eckert's decision to settle Case Number 2009 CH 2305 and to sign the Settlement Agreement.

## COUNT I
### (Legal Malpractice-As to All Defendants)

39. Plaintiff repeats and realleges Paragraphs 1 through 38 of the Complaint as though fully set forth herein.

40. At all times relevant hereto, each Defendant had an attorney-client relationship with Eckert, and a duty, among other things, to: zealously represent Eckert's interests; provide Eckert with an informed understanding of his legal rights, obligations and their practical implications; zealously represent him; and negotiate results that were advantageous to him and him alone.

41. As Eckert's attorneys, Defendants were required to possess and apply the knowledge and use the skill and care ordinarily used by reasonably careful attorneys.

42. Defendants breached those duties, and the standard of care governing the conduct of attorneys licensed to practice law in the State of Illinois, and committed numerous acts or

10

omissions constituting negligence in connection with their recommendation that Eckert settle the lawsuit against Steiner and others on the terms set forth therein.

43. Defendants were deviated from the standard of care in recommending that Eckert accept the proposed settlement and sign the Settlement Agreement, because it did not make the payment of the $700,000 plus interest due to Steiner conditioned upon the raising of the monies by Levin and F & P through the sale of equity in Eckert's businesses. Defendants failed to adequately inform and advise Plaintiff that the payment of $700,000 plus interest due to Steiner under the Settlement Agreement should have been conditioned on the success of Levin and F & P in raising the money from Defendants' clients or third-parties necessary to fulfill the Settlement Agreement, or that if they failed to raise the funds necessary to fund the settlement, Eckert would be left holding the bag.

44. Plaintiff has suffered damages as a result of Defendants' professional negligence as set forth herein.

WHEREFORE, Plaintiff, JEFFERY P. ECKERT, prays that this Court enter judgment in his favor against Defendants, NEAL H. LEVIN and FREEBORN & PETERS LLP, for compensatory damages in an amount to be determined at trial, but currently believed to be potentially as much as $1,000,000, the amount of the monies due by Eckert to Steiner under the Settlement Agreement as well as the monies Eckert would have recovered from Steiner by way of his Counterclaim, plus interest and costs, and for any and all other relief that this Court deems appropriate under the circumstances.

## COUNT II
### (<u>Fraud-As to All Defendants</u>)

45. Plaintiff repeats and realleges paragraphs 1 through 38 of the Complaint as though fully set forth therein.

46. Defendants induced Eckert to enter into the Settlement Agreement on the representation and promise to raise sufficient monies through the sale of an equity interest in one or more of Eckert's businesses to satisfy the amount due to Steiner by Eckert under the Settlement Agreement.

47. In order to induce Eckert to enter into the Settlement Agreement, Defendants negotiated the arrangement outside the presence, and without the knowledge of, Eckert's attorney, Drenk.

48. Defendants never intended nor was Levin capable of raising the monies necessary to fund the payments due by Eckert to Steiner under the Settlement Agreement.

49. Eckert relied upon Defendants' promise to raise the money that would become due to Steiner by Eckert under the Settlement Agreement in agreeing to execute the Settlement Agreement.

50. Eckert was damaged as alleged herein by virtue of his reliance on the false representations and promises made by Defendants to Eckert.

WHEREFORE, Plaintiff, JEFFERY P. ECKERT, prays that this Court enter judgment in his favor against Defendants, NEAL H. LEVIN and FREEBORN & PETERS LLP, for compensatory damages in an amount to be determined at trial, but currently believed to be potentially as much as $1,000,000, the amount of the monies due by Eckert to Steiner under the Settlement Agreement as well as the monies Eckert would have recovered from Steiner by way of his Counterclaim, plus punitive damages in an amount to punish and deter Defendants from

engaging in such misconduct in the future, plus interest and costs, and for any and all other relief that this Court deems appropriate under the circumstances.

                Respectfully submitted,

                **JEFFERY P. ECKERT,**
                Plaintiff

                By: /s/Jefferey O. Katz
                    One of His Attorneys

Jefferey O. Katz
The Patterson Law Firm LLC
One North LaSalle Street, Suite 2100
Chicago, Illinois 60602
T: (312) 223-1699
ARDC No. 6283209

Dated: November 19,2013